UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| CHRISTOPHER MICHAEL NASSAR, | * | |
| | * | |
| Plaintiff, | * | |
| | * | |
| v. | * | Civil Action No. 16-10798-ADB |
| | * | |
| PATRICIA RUZE, et al., | * | |
| | * | |
| Defendants. | * | |
| | * | |

## MEMORANDUM AND ORDER ON MOTION FOR SUMMARY JUDGMENT

BURROUGHS, D.J.

This case concerns the medical treatment of Plaintiff Christopher Michael Nassar, a state prisoner in the custody of the Massachusetts Department of Correction ("DOC") who is currently incarcerated at the Massachusetts Correctional Institution in Norfolk, Massachusetts ("MCI Norfolk"), and was previously incarcerated at the Massachusetts Correctional Institution in Concord, Massachusetts ("MCI Concord"). Pursuant to the Court's prior orders, several of the named defendants and asserted claims have already been dismissed from this action. [ECF Nos. 36, 45, 66]. The remaining Defendants are the Massachusetts Partnership for Correctional Healthcare, LLC ("MPCH"), a contractor that provides medical services to inmates under the care and custody of the DOC, and the following practitioners who worked at the institutions where Plaintiff received medical care: Patricia Ruze, M.D., Lawrence Churchville, M.D., Geraldine Somers, M.D., Ziesl Mayaan, NP, and Byron Shoemaker, RN.

Currently pending before the Court is Defendants' motion for summary judgment on Plaintiff's remaining claims under 42 U.S.C. § 1983, which assert that Defendants acted with deliberate indifference to his serious medical needs and retaliated against him for filing this

lawsuit. [ECF No. 81]. For the reasons stated herein, the motion is <u>GRANTED</u>.

## I.    FACTUAL BACKGROUND

Since Defendants filed their motion for summary judgment on May 30, 2017, Plaintiff has neither opposed the motion nor filed a statement of material facts. The Court may therefore "consider the summary judgment motion unopposed, and take as uncontested all evidence presented with that motion." <u>Perez-Cordero v. Wal-Mart P.R.</u>, 440 F.3d 531, 533−34 (1st Cir. 2006); <u>see</u> L.R., D. Mass. 56.1 ("Material facts of record set forth in the statement required to be served by the moving party will be deemed for purposes of the motion to be admitted by opposing parties unless controverted by the statement required to be served by opposing parties."). Accordingly, the following summary of the medical care that Plaintiff received for his ulcerative colitis ("UC")[1] stems from Defendants' statement of facts and supporting evidence. [ECF No. 83] ("Defs. Facts").

### A.    Plaintiff's Medical Care at MCI Concord

In January 2013, Plaintiff complained of bleeding diarrhea with mucus, which he said had begun six to seven years prior. Defs. Facts ¶ 19. He underwent a stool analysis, which returned negative for ova, parasites, and other bacteria. Id. ¶ 20. He also had a pending referral to the Gastrointestinal Clinic ("GI Clinic") at Lemuel Shattuck Hospital ("LSH"), but on March 3, Plaintiff refused to visit the GI Clinic, saying that he did not wish to speak with the physicians at the GI Clinic for any reason. Id. ¶¶ 20−22. Plaintiff later changed his mind about the GI Clinic consultation, and Defendant Dr. Ruze rescheduled Plaintiff for an appointment on April 9. Id. ¶ 23. On March 24, Plaintiff conveyed in a sick slip that he did not want to visit the GI Clinic and

---

[1] Ulcerative colitis is a chronic disease of the colon in which the lining of the colon becomes inflamed and develops ulcers. Defs. Facts ¶ 19.

then refused to meet with a nurse practitioner to discuss the sick slip. Id. ¶¶ 24–25. On April 9, he cancelled the appointment with the GI Clinic. Id. ¶ 26. Dr. Ruze asked a nurse practitioner to discuss with Plaintiff his need for an appointment with the GI Clinic, but he declined a visit from the nurse practitioner. Id. ¶¶ 27–28.

On June 19, Dr. Ruze wrote a letter to Plaintiff to address the concerns he had regarding intestinal disturbances, nausea, a possible vitamin D deficiency, and a possible intestinal infection. Id. ¶ 30. She referenced his refusal to attend his last two appointments with mid-level nurse practitioners, who could diagnose and prescribe medication, and explained that he needed to see a mid-level provider to address his medical concerns. Id. She also explained that the primary method of diagnosing an infection in patients with UC is to perform a colonoscopy, but before undergoing a colonoscopy, Plaintiff needed to meet with the GI Clinic so that his specialists could identify any unique issues with his medical condition. Id.; [ECF No. 83-3 at 27].

On June 23, in response to Plaintiff's complaints of shortness of breath and swelling in both of his legs, a registered nurse examined Plaintiff and observed no edema (excess of watery fluid collecting in the tissues of the body) of his left leg, but noted mild swelling of his right leg. Defs. Facts ¶ 32. The following day, a nurse practitioner measured Plaintiff's legs and noted slight edema of his ankles. Id. ¶ 33. On June 25, Plaintiff cut himself to draw the attention of the medical staff to his inability to pass urine. Id. ¶ 35. A nurse practitioner examined him and observed edema in both of his legs. Id. Labs that had been run the day before showed that he had acute renal failure. To address the renal failure, the nurse sent Plaintiff for urgent admission to LSH. Id.

At LSH, testing showed that Plaintiff had Minimal Change Disease (a kidney disease

wherein a large amount of protein is lost in the urine) and glomerulonephritis (inflammation of

the kidney). Id. ¶ 36. The GI Clinic recommended that, among other things, Plaintiff continue

using a steroid for three months, take Lasix as needed to achieve diuresis, start a three-month

course of Coumadin, and attend a follow-up appointment with the GI Clinic. Id. ¶ 36. Following

his discharge from LSH on August 4, Plaintiff initially refused to use prednisone, but Dr. Ruze

explained the need for prednisone and ultimately convinced him to take the steroid. Id. ¶ 37.

When Dr. Ruze examined Plaintiff on August 26, however, he was refusing to take the

prednisone, as well as the Coumadin and Mesalamine, all of which would have helped regulate

his UC and glomerulonephritis. Id. ¶ 38. One week later, Plaintiff again refused to visit the GI

Clinic. Id. ¶ 40.

On October 18, Plaintiff wrote a note to Dr. Ruze stating that he did not feel well and that

he feared that he had been poisoned by a correctional officer. Id. ¶ 46. Dr. Ruze asked that a

nurse practitioner schedule an appointment with Plaintiff. Id. ¶ 46. On October 23, Dr. Ruze

wrote a letter to Plaintiff, in light of the recurrence of his bowel issues, and proposed collecting

stool samples to evaluate for blood, bacteria, and parasites, and scheduling a telemedicine visit

with the GI Clinic to determine whether he was experiencing a UC flare or an infection. Id.;

[ECF No. 83-3 at 55]. Shortly thereafter, Plaintiff transferred to MCI Norfolk and was no longer

under Dr. Ruze's care. Id. ¶ 48.

**B.      Plaintiff's Medical Care at MCI Norfolk**

On December 21, 2015, Plaintiff told a nurse practitioner that a specialist said he should

use narcotics to address loose bowel movements, although no such recommendation existed in

his record. Defs. Facts ¶ 50. On January 1, 2016, Plaintiff demanded opiates to treat his UC. Id. ¶

51. The nurse practitioner explained to Plaintiff that his record did not contain a recommendation

for opiates and that it was not the standard practice to prescribe opiates to address his particular medical issues. Id. Plaintiff responded that he did not want to continue taking Remicade to treat his UC, no longer wanted to visit with the staff at MCI Norfolk, and refused to see the GI Clinic. Id.

On January 27, Plaintiff consulted with the GI Clinic via telemedicine and requested opiate therapy, but the GI Clinic physicians did not feel comfortable recommending opiates, which would not treat his underlying inflammation. Id. ¶ 52. They recommended that he provide a stool sample for analysis, add fish oil supplements to his medication list, increase his dosage of vitamin D, and have a follow up appointment via telemedicine in six to eight weeks. Id. ¶¶ 52−53.

On February 17, Defendant NP Mayaan prescribed Plaintiff a one-month trial of opiate medication. Id. ¶ 54. She thought that because Plaintiff's UC had not yet been fully controlled, pain medication might provide sufficient relief to enable him to consider longer-term solutions. Id. ¶ 54. On March 15, Plaintiff again consulted with the GI Clinic physicians via telemedicine. Id. ¶ 55. They recommended that he restart Remicade or another biologic medicine that would treat his underlying UC, not just his symptoms. Id.; [ECF No. 83-3 at 64]. Plaintiff was informed of the risks of developing colonic dysplasia, particularly in light of stopping his UC medication, but he declined to restart any UC medication and refused to have a colonoscopy. Defs. Facts ¶ 55; [ECF No. 83-3 at 64−65]. On March 23, Plaintiff was found in possession of "homebrew," an alcoholic drink made by inmates, and had to begin weaning off his opiate medication, as providers cannot prescribe narcotics to inmates found in possession of illicit substances. Defs. Facts ¶ 57. NP Mayaan encouraged Plaintiff to restart Remicade; Plaintiff agreed to do so if he

were also prescribed a low dose of opiates. Id. ¶ 59. He ultimately rescinded that proposal and refused to restart Remicade altogether. Id. ¶ 60.

On April 13, a registered nurse evaluated Plaintiff in response to his claims that he was experiencing his worst UC flare and that there was blood in his stool. Id. ¶¶ 63−64. That afternoon, Defendant RN Shoemaker saw Plaintiff for complaints of rectal bleeding, and conferred with an advance practice provider who said that she would examine Plaintiff the next day. Id. ¶ 64; [ECF No. 83-3 at 72]. The following morning, a certified physician's assistant prescribed Plaintiff a low dose of prednisone to alleviate the bleeding and UC flare. Defs. Facts ¶ 65. On April 28, a certified nurse practitioner conducted a chronic disease assessment of Plaintiff and also prescribed him prednisone. Id. ¶ 67. From May 3 to May 10, Plaintiff was admitted to the Ambulatory Care Center at LSH for his UC flare and had a colonoscopy, which showed moderate intestinal inflammation. Id. ¶¶ 69−70. The GI Clinic also noted that it was considering Humira therapy for Plaintiff and planned to follow up with him in two to three weeks. Id. ¶ 70.

The day after his return to MCI Norfolk, Defendant Dr. Churchville examined Plaintiff, contacted LSH to discuss re-admitting Plaintiff to manage his continuing pain from his UC flare, and sent him to the emergency room at Norwood Hospital. Id. ¶¶ 74−75. Plaintiff was transferred from Norwood Hospital to LSH where the physicians were in the process of arranging Humira therapy for him, but they acknowledged that there would be a delay because Plaintiff needed to continue tapering off of prednisone. Id. According to the LSH physicians, obtaining authorization to provide Humira to Plaintiff was also going to be "challenging" given that Plaintiff's UC had been "well-controlled" with Remicade for several months until Plaintiff self-discontinued it, and then refused to restart it, notwithstanding the GI Clinic's recommendation that he do so. Id. ¶ 76; [ECF No. 83-3 at 89]. Although Plaintiff had been told multiple times that

narcotics are not the appropriate choice for managing inflammatory bowel pain, he demanded that the GI Clinic start his Humira therapy and prescribe him Oxycodone or Tramadol until he received Humira. Defs. Facts ¶ 76; [ECF 83-3 at 89]. According to the GI Clinic physicians, Plaintiff was "demanding and manipulative when it [came] to his medications, particularly pain medications," kept the LSH staff from evaluating his bowel movements, and claimed "that his UC symptoms [were] more severe than the objective data demonstrate[d]." Defs. Facts ¶ 76; [ECF 83-3 at 89].

When Plaintiff returned to MCI Norfolk on May 20, he demanded pain medication and refused all other treatment. Defs. Facts ¶ 78. He reported severe abdominal pain and numerous bloody bowel movements, but refused to show the examining nurse his stool. Id. ¶ 81. On May 21, Plaintiff again stated that he was in severe pain but would not let a licensed practical nurse see his stool. Id. ¶ 82. The nurse noted a distended vein in Plaintiff's arm and notified the on-call provider, who sent Plaintiff to the Norwood Hospital emergency room. Id. ¶ 82. Plaintiff returned from Norwood Hospital that evening after he refused medical treatment. Id. ¶ 83. On May 23, Dr. Churchville observed that Plaintiff had thrombophlebitis[2] and ordered an ultrasound for Plaintiff's left forearm, which was negative for deep vein thrombosis. Id. ¶¶ 86−89. Dr. Churchville ultimately diagnosed Plaintiff with superficial thrombophlebitis and called Dr. Ruze to discuss transferring Plaintiff to the infirmary at Souza Baranowski Correctional Center ("SBCC"),[3] in light of Plaintiff's noncompliance with his providers' treatment recommendations,

---

[2] Thrombophlebitis is a circulatory problem that develops when a blood clot slows the circulation in a vein, either right under the skin (superficial) or deep within a muscle (deep vein thrombosis). Defs. Facts ¶ 87.
[3] The infirmary at SBCC is staffed 24 hours each day and is not a disciplinary unit. Defs. Facts ¶ 91. Patients that might be sent to the SBCC infirmary for observation include patients on hunger strikes after missing multiple meals, diabetic patients who refuse to take insulin, and patients with cardiac histories who refuse to take cardiac medication. Id.

and because the SBCC infirmary could provide closer monitoring than was available at MCI Norfolk. Id. ¶¶ 90, 92. Dr. Ruze indicated that she would accept Plaintiff at the SBCC infirmary so that Plaintiff could receive a "higher level of care," given his behavioral issues, UC, and the new diagnosis of superficial thrombophlebitis. Id. ¶ 93.

After Plaintiff transferred to the SBCC infirmary on May 24, Defendant Dr. Somers examined Plaintiff and noted thrombophlebitis in both of his arms, which she treated with warm compresses. Id. ¶ 94. Because Plaintiff denied experiencing any abdominal pain, cramping, or loose bowel movements, Dr. Somers provided him Motrin for comfort. Id. On May 26, Dr. Somers discharged Plaintiff from the SBCC infirmary, as his thrombophlebitis was resolving with Motrin and warm compresses. Id. ¶ 95.

On June 2, Plaintiff claimed that he was suffering from body-wide edema and needed Lasix to treat his condition. Id. ¶ 96. Although Plaintiff said that he requested Lasix on three prior occasions, the June 2 request was the first request reflected in his patient record from 2016. Id. ¶ 96. Plaintiff submitted another request for Lasix the following day. Id. ¶ 97. On June 6, a nurse practitioner noted edema in both of Plaintiff's lower extremities, but nowhere else on his body, and prescribed him Lasix. Id. ¶¶ 97−98. On June 13, a MCI Norfolk staff member saw Plaintiff after he failed to appear in the medication line a sufficient number of times to comply with his Lasix prescription. Id. ¶ 100. Plaintiff did not complain of a UC flare or renal issues again until December 2016. Id. ¶ 105.

## II.    PROCEDURAL BACKGROUND

On April 29, 2016, Plaintiff filed this lawsuit alleging that he was being denied adequate medical treatment and that he was close to dying. [ECF No. 1]. He also filed a motion for an immediate screening of the complaint and a temporary restraining order ("TRO") seeking to

compel the defendants to transport him to a hospital. [ECF No. 2]. The Court scheduled a

hearing on the TRO motion for May 3. [ECF No. 6]. Shortly thereafter, the parties filed a joint

motion to continue the hearing on the TRO motion, as Plaintiff was scheduled to be evaluated at

LSH regarding whether he needed emergency treatment. [ECF No. 13]. Accordingly, the Court

denied the TRO motion as moot and ordered the parties to submit further status reports, which

they filed on May 9 and May 18. [ECF Nos. 14–18].

On June 13, Plaintiff filed an amended complaint asserting the following claims: Eighth

Amendment violations (Count I), retaliation (Count II), and Religious Land Use and

Institutionalized Persons Act ("RLUIPA") violations (Count III). [ECF No. 34] ("Amended

Complaint"). On June 16, the Court dismissed the RLUIPA claims, as they involved new

defendants and did not arise out of the same series of transactions or occurrences as Plaintiff's

original claims based on inadequate medical care. [ECF No. 36].[4] Other defendants were

dismissed from the case because Plaintiff failed to state a claim against them, to name them in

the Amended Complaint, or to properly serve them. [ECF No. 45]. On May 30, 2017, the

remaining Defendants filed the instant motion for summary judgment. [ECF No. 81].

## III.    LEGAL STANDARD

A party's failure to oppose summary judgment is ordinarily "fatal to its case." Perez-

Cordero, 440 F.3d at 534. However, "[e]ven when faced with an unopposed motion for summary

judgment, a court still has the obligation to test the undisputed facts in the crucible of the

---

[4] On June 13, 2016, Plaintiff also filed two TRO motions requesting that the Court enjoin any
retaliation against him, and require that he be provided with a religious diet, and that he be
transferred to Boston Medical Center. [ECF Nos. 28 31]. Both TRO motions were denied. [ECF
Nos. 36, 42].

applicable law in order to ascertain whether judgment is warranted." <u>Velez v. Awning Windows Inc.</u>, 375 F.3d 35, 42 (1st Cir. 2004). Summary judgment is appropriate where the moving party can show that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "[A]n issue is 'genuine' if it 'may reasonably be resolved in favor of either party.'" <u>Robinson v. Cook</u>, 863 F. Supp. 2d 49, 60 (D. Mass. 2012) (quoting <u>Vineberg v. Bissonnette</u>, 548 F.3d 50, 56 (1st Cir. 2008)). "A fact is material if its resolution might affect the outcome of the case under the controlling law." <u>Cochran v. Quest Software, Inc.</u>, 328 F.3d 1, 6 (1st Cir. 2003) (citation omitted). Thus, "[a] genuine issue exists as to such a fact if there is evidence from which a reasonable trier could decide the fact either way." <u>Id.</u> "To succeed in showing that there is no genuine dispute of material fact, the moving party must direct [the court] to specific evidence in the record that would be admissible at trial. That is, it must 'affirmatively produce evidence that negates an essential element of the non-moving party's claim,' or, using 'evidentiary materials already on file . . . demonstrate that the non-moving party will be unable to carry its burden of persuasion at trial.'" <u>Ocasio-Hernández v. Fortuño-Burset</u>, 777 F.3d 1, 4−5 (1st Cir. 2015) (quoting <u>Carmona v. Toledo</u>, 215 F.3d 124, 132 (1st Cir. 2000)).

When reviewing the record, the Court "must take the evidence in the light most flattering to the [non-moving party], indulging all reasonable inferences in that party's favor." <u>Cochran</u>, 328 F.3d at 6 (citation omitted). The First Circuit has noted that this review "is favorable to the nonmoving party, but it does not give him a free pass to trial." <u>Hannon v. Beard</u>, 645 F.3d 45, 48 (1st Cir. 2011). "The factual conflicts upon which he relies must be both genuine and material," <u>Gomez v. Stop & Shop Supermarket Co.</u>, 670 F.3d 395, 396–97 (1st Cir. 2012), and the court may discount "conclusory allegations, improbable inferences, and unsupported speculation."

<u>Cochran</u>, 328 F.3d at 6 (quoting <u>Medina-Munoz v. R.J. Reynolds Tobacco Co.</u>, 896 F.2d 5, 8 (1st Cir. 1990)). Further, "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 252 (1986).

## IV. DISCUSSION

Defendants move for summary judgment on Plaintiff's remaining claims for violations of the Eighth Amendment and retaliation. They contend that they are entitled to summary judgment because (1) Plaintiff failed to exhaust the available administrative remedies before filing this lawsuit, as required by the Prison Litigation Reform Act of 1995 ("PLRA"); (2) no reasonable fact finder could conclude that Defendants acted with deliberate indifference to Plaintiff's medical needs or took an adverse action against him with retaliatory intent; and (3) the individual Defendants are protected by qualified immunity. Given that the Court agrees with Defendants with respect to their first two arguments, the Court does not reach the third.

### A. Exhaustion of Administrative Remedies

The PLRA provides that "[n]o action shall be brought with respect to prison conditions under section 1983 . . . , or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e. "A centerpiece of the PLRA's effort 'to reduce the quantity . . . of prisoner suits' is an 'invigorated' exhaustion provision." <u>Woodford v. Ngo</u>, 548 U.S. 81, 84 (2006) (citing 42 U.S.C. § 1997e(a)). Exhaustion is not "left to the discretion of the district" but is considered "mandatory." <u>Id.</u> Proper exhaustion of administrative remedies entails "using all steps that the agency holds out, and doing so properly (so that the agency addresses the issues on the merits)." <u>Woodford</u>, 548 U.S. at 90 (quoting <u>Pozo v. McCaughtry</u>, 286 F.3d 1022, 1024 (7th Cir. 2002));

id. (proper exhaustion "demands compliance with an agency's deadlines and other critical procedural rules"). A court "may not excuse a failure to exhaust, even to take [special] circumstances into account." Ross v. Blake, 136 S. Ct. 1850, 1856 (2016). One important qualifier is that the remedies must be "available" to the inmate, meaning that "an inmate is required to exhaust those, but only those, grievance procedures that are 'capable of use' to obtain 'some relief for the action complained of.'" Id. at 1859 (citing Booth v. Churner, 532 U.S. 731, 738 (2001)). For example, an administrative procedure is unavailable where "it operates as a simple dead end . . . with officers unable or consistently unwilling to provide any relief to aggrieved inmates," or is "so opaque that it becomes, practically speaking, incapable of use," or prison administrators "thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." Id. at 1859–60.

> 1.      MPCH Grievance Procedure

Under MPCH's Clinical Grievance Mechanism – Policy 12.00, inmates have three opportunities to present a complaint about their medical care for review. Defs. Facts ¶ 14; [ECF No. 83-1 at 15–19]. First, an inmate may make an informal complaint to his Health Services Administrator ("HSA"). Id. ¶ 15; [ECF No. 83-1 at 16]. Second, if the inmate is not satisfied with the response he receives from the HSA, the inmate may file a formal written grievance using the "Inmate Medical and Mental Health Grievance & Appeal Form," to which the HSA (or his or her designee) must respond within 10 working days. Defs. Facts ¶ 15; [ECF No. 83-1 at 17]. Third, an inmate may appeal a decision on the formal written grievance to the MPCH Grievance and Appeal Coordinator by mailing a completed Inmate Grievance and Appeal Form to MPCH's headquarters. Defs. Facts ¶ 15; [ECF No. 83-1 at 17]. The decision of the MPCH Grievance and Appeal Coordinator is final. Defs. Facts ¶ 15; [ECF No. 83-1 at 18].

On February 18, 2015, Plaintiff submitted a formal written grievance to his HSA, requesting a single cell with his own toilet to accommodate his UC. Defs. Facts ¶ 16. He received a written decision on February 23, which stated that Plaintiff did not qualify for a single cell, but that the HSA recommended that Plaintiff's care provider order a dry cell for him so that he might move to a unit with a separate bathroom down the hall. Id.; [ECF No. 83-1 at 6]. On December 29, 2015, Plaintiff filed a separate formal written grievance to his HSA requesting a change in primary care providers. Defs. Facts ¶ 17. On January 6, 2016, Plaintiff received a denial of his request as "non-grievable." Id.; [ECF No. 83-1 at 11]. Plaintiff did not appeal either of these grievances, although both written decisions indicated that Plaintiff must file an appeal within ten working days from his receipt of the decision. Defs. Facts ¶ 18; [ECF No. 83-1 at 6, 10]. The record contains no other evidence of any formal written grievance or appeal submitted by Plaintiff concerning the medical care at issue in this case.

2.     <u>Exhaustion Defense</u>

Defendants raise exhaustion as an affirmative defense and argue that Plaintiff did not exhaust his right to appeal through MPCH's grievance policy before filing this case. [ECF No. 62 at 12]; <u>see</u> <u>Cruz Berrios v. Gonzalez-Rosario</u>, 630 F.3d 7, 11 (1st Cir. 2010) (exhaustion must be "raised and proved by the defense"). For the purposes of the PLRA, "[p]ursuing administrative remedies by taking some, but not all, of the steps available does not constitute exhaustion of administrative remedies." <u>Rodriguez Rodriguez v. Garcia</u>, No. 09−1094, 2011 WL 6057746, at *3 (D.P.R. Dec. 6, 2011). An administrative remedy is "available" under the PLRA even if it is an "optional, rather than mandatory" avenue for review. <u>Johnson v. Thyng</u>, No. 09−1701, 2010 WL 965259, at *3–4 (1st Cir. Mar. 18, 2010) (failure to exhaust where plaintiff did not file a level-three appeal pursuant to a grievance procedure that stated, "If an inmate is not

satisfied with the Warden/Director's response, he/she may file an appeal using the grievance form, to the Commissioner's office"). Here, Plaintiff first filed a formal written grievance in February 2015 requesting a single cell with its own toilet and filed a second written grievance in December 2015 seeking to change medical care providers. Although he received decisions on both grievances (a partial allowance and a denial, respectively), which informed him that he could appeal within ten working days of receipt thereof, he never appealed either decision to the MPCH Grievance and Appeal Coordinator. Nothing in the record suggests that an appeal was unavailable to Plaintiff, particularly considering that he complied with two of the three levels of review under MPCH's applicable policy. In Lopes v. Riendeau, this court reviewed a prior version of the MPCH policy at issue here, and concluded that an inmate's failure to appeal to the MPCH Grievance and Appeal Coordinator precluded the exhaustion of administrative remedies, including with respect to requests that had been partially approved. No. 14–10679, 2015 WL 1401334, at *9, (D. Mass. Mar. 2, 2015), adopted in part and rejected in part on other grounds, 2015 WL 1411409 (D. Mass. Mar. 26, 2015) ("The fact that plaintiff received relief at the second level does not preclude the appeal to the third level."). Thus, because no reasonable jury could conclude that Plaintiff exhausted the available administrative remedies, the Court grants summary judgment in favor of Defendants. As discussed below, even assuming that Plaintiff could cure his failure to exhaust administrative remedies, his claims nonetheless fail on the merits.

### B.      Eighth Amendment Violations (Count I)

Count I alleges violations of the Eighth Amendment, which applies to the states through the Fourteenth Amendment. See Torraco v. Maloney, 923 F.2d 231, 233 n.3 (1st Cir. 1991). In this context, the Eighth Amendment protects prisoners from "deliberate indifference to serious

medical needs," <u>Feeney v. Corr. Med. Servs., Inc.</u>, 464 F.3d 158, 161–62 (1st Cir. 2006) (quoting

<u>Estelle v. Gamble</u>, 429 U.S. 97, 105–06 (1976)), meaning that a violation arises when medical

care is "so inadequate as to shock the conscience." <u>Id.</u> at 162 (quoting <u>Torraco</u>, 923 F.2d at 235).

To prevail on a claim for deliberate indifference, the plaintiff must satisfy both an objective and

a subjective inquiry. <u>Perry v. Roy</u>, 782 F.3d 73, 78 (1st Cir. 2015). The objective prong requires

proof of a sufficiently serious medical need, as in "one that has been diagnosed by a physician as

mandating treatment, or one that is so obvious that even a lay person would easily recognize the

necessity for a doctor's attention." <u>Kosilek v. Spencer</u>, 774 F.3d 63, 82 (1st Cir. 2014) (en banc)

(quoting <u>Gaudreault v. Municipality of Salem, Mass.</u>, 923 F.2d 203, 208 (1st Cir. 1990)). Here,

Defendants assume without conceding that Plaintiff had a serious medical need and proceed to

the subjective inquiry. [ECF No. 82 at 5].

The subjective prong requires that the plaintiff show that prison officials possessed a

sufficiently culpable state of mind, namely, deliberate indifference to the plaintiff's health or

safety. <u>Perry</u>, 782 F.3d at 78. "For purposes of this subjective prong, deliberate indifference

'defines a narrow band of conduct' and requires evidence that the failure in treatment was

purposeful." <u>Kosilek</u>, 774 F.3d at 83 (citation omitted). "The obvious case would be a denial of

needed medical treatment in order to punish the inmate." <u>Feeney</u>, 464 F.3d at 162 (quoting

<u>Watson v. Caton</u>, 984 F.2d 537, 540 (1st Cir. 1993)). Deliberate indifference may also lie in

"wanton" or "reckless" actions, although recklessness is understood "not in the tort law sense but

in the appreciably stricter criminal-law sense, requiring actual knowledge of impending harm,

easily preventable." <u>Id.</u>

In contrast, an "inadvertent failure to provide adequate medical care" does not give rise to

a constitutional violation because it "cannot be said to constitute 'an unnecessary and wanton

infliction of pain' or to be 'repugnant to the conscience of mankind.'" Estelle, 429 U.S. at 105–
06. Similarly, "an official's failure to alleviate a significant risk that he should have perceived
but did not, while no cause for commendation, cannot under [Supreme Court case law] be
condemned as the infliction of punishment." Farmer v. Brennan, 511 U.S. 825, 838 (1994).
Substandard treatment, "even to the point of malpractice," does not violate the Eighth
Amendment. Feeney, 464 F.3d at 162 (quoting Layne v. Vinzant, 657 F.2d 468, 474 (1st Cir.
1981)). The Constitution "does not impose upon prison administrators a duty to provide care that
is ideal, or of the prisoner's choosing." Kosilek, 774 F.3d at 82; United States v. Derbes, 369
F.3d 579, 583 (1st Cir. 2004) (prison administrators are "by no means required to tailor a perfect
plan for every inmate . . . ."). Treatment that may be subject to some disagreement as to whether
it was the appropriate course of action falls short of establishing a constitutional violation.
Kosilek, 774 F.3d at 82; see also Sires v. Berman, 834 F.2d 9, 13 (1st Cir. 1987) ("Where the
dispute concerns not the absence of help, but the choice of a certain course of treatment, or
evidences mere disagreement with considered medical judgment, [the Court] will not second
guess the doctors.").

1.    MCI Concord: Defendant Dr. Ruze

Plaintiff alleges that while he was incarcerated at MCI Concord, he notified the medical
staff, including Dr. Ruze, that he was experiencing severe diarrhea, intestinal distress, bleeding,
and an inability to urinate, but that their failure to treat these conditions caused his edema and led
to his hospitalization. Am. Compl. ¶¶ 22–36.

Plaintiff's narrative, however, is not rooted in the record evidence, which reflects a story
of unrequited offers of appropriate care. Between March and April 2013, Plaintiff refused to
attend an appointment with the specialists at the GI Clinic, cancelled that appointment again after

Dr. Ruze rescheduled the consultation on his behalf, and twice declined to meet with nurse practitioners. On June 19, Dr. Ruze wrote a detailed letter to Plaintiff explaining the need for him to see the GI Clinic so that he could have a colonoscopy, the principal method for diagnosing an infection related to his UC. In the period of time immediately preceding his hospitalization on June 25, a registered nurse or nurse practitioner responded to Plaintiff's complaints of edema and shortness of breath on June 22, 23, 24, and 25. His providers ran lab tests on June 24, received the results by June 25, diagnosed his acute renal failure, and sent him to LSH for urgent admission that same day. At LSH, the GI Clinic recommended continued use of Lasix to achieve diuresis, a three-month course of Coumadin, and a follow-up appointment with the GI Clinic. Yet, after his discharge from LSH, Plaintiff rejected the treatment plan, declined to visit the GI Clinic, and refused to take prednisone, Coumadin, and Mesalamine for the treatment of his UC.

Here, even when viewing the facts in the light most favorable to Plaintiff, the record would not permit a reasonable fact-finder to conclude that Dr. Ruze, or the other providers at MCI Concord, treated Plaintiff in a manner so inadequate as to "shock the conscience," Torraco, 923 F.2d at 234, or that they "[knew] of and disregard[ed] an excessive risk to [Plaintiff's] health or safety." Farmer, 511 U.S. at 837. Dr. Ruze scheduled and rescheduled appointments for Plaintiff to see the GI Clinic, wrote detailed letters to him in response to his expressed concerns, and responded swiftly to his complaints. That Plaintiff refused to attend consultations with specialists and cancelled appointments with nurses does not in any way suggest deliberate indifference on the part of the medical staff. Courts "have consistently refused to create constitutional claims out of disagreements between prisoners and doctors about the proper course of a prisoner's medical treatment." Watson, 984 F.2d at 540. Here, the record reflects a concerted effort by Dr. Ruze and other staff members to respond to Plaintiff's complaints despite his

unwillingness to comply with their recommended treatment plans. For these reasons, no reasonable fact-finder would find Dr. Ruze liable for violating the Eighth Amendment.

2. MCI Norfolk: Defendants Dr. Churchville, Dr. Somers, NP Mayaan, and RN Shoemaker

Plaintiff alleges that in March or April 2016, and again at the time of filing his Amended Complaint, Defendants at MCI Norfolk failed to treat him and ignored him for a significant period of time while he was suffering from bloody diarrhea. Am. Compl. ¶¶ 38−41, 42−47, 57−75. Moreover, he alleges that he was improperly denied access to his prescribed medications, Lasix and Humira, and that his medical needs required that he be transferred to Boston Medical Center. Id. ¶¶ 50−57, 76−77.

First, there is no evidence that NP Mayaan acted with deliberate indifference or knowingly disregarded an excessive health risk to Plaintiff. She prescribed him opiate medication as a one-month trial, taking into account Plaintiff's request for pain medication and the efficacy of prior treatment methods. After Plaintiff began weaning off his opiate medication, NP Mayaan encouraged Plaintiff to restart Remicade based on the recommendations of the GI Clinic specialists. She even agreed to present to the GI Clinic Plaintiff's proposal that he be prescribed a low dosage of opiates if he took Remicade, although Plaintiff ultimately declined to take Remicade altogether. The undisputed evidence shows that NP Mayaan was supportive of the treatment options recommended by Plaintiff's specialists and also attentive to Plaintiff's preferences. There is therefore no basis for finding that her conduct was so inadequate as to shock the conscience.

Second, although Plaintiff alleges that RN Shoemaker "berated" Plaintiff for his repeated submission of sick call slips, and told Plaintiff that he would not receive medical care because Plaintiff's parents called MCI Norfolk to inquire about his health, there is no evidence in the

record that remotely supports these allegations. Plaintiff cannot rest on the "conclusory allegations contained in [his] complaint, but must set forth evidence establishing the existence of an essential element to [his] claim." Torraco, 923 F.3d at 235; Niemic v. UMass Corr. Health, 89 F. Supp. 3d 193, 208 (D. Mass. 2015) ("bare conjecture cannot suffice to bar entry of summary judgment" where plaintiff failed to provide evidence in support of his claims). Thus, the record evidence would not allow a trier of fact to conclude that RN Shoemaker acted with deliberate indifference to Plaintiff's serious medical needs.

Third, the record is devoid of any evidence that Dr. Churchville or Dr. Somers acted with deliberate indifference in treating Plaintiff at MCI Norfolk or the SBCC infirmary. When Plaintiff complained of continuing pain following his discharge from LSH in May 2016, Dr. Churchville immediately referred him for outside treatment to manage his UC flare. When Plaintiff later presented with a distended vein in his left arm, Dr. Churchville examined him, ordered an ultrasound, and diagnosed his superficial thrombophlebitis. He then conferred with Dr. Ruze before transferring Plaintiff to SBCC infirmary so that Plaintiff could receive a higher level of observation and care than that available at MCI Norfolk. Both Dr. Churchville and Dr. Ruze believed that the SBCC infirmary was the preferable environment for Plaintiff, considering his history of noncompliance with recommended treatment plans. There is not sufficient evidence to create a genuine dispute of material fact as to Dr. Churchville's thorough response to Plaintiff's complaints and his decision to send Plaintiff to specialists and facilities that better suited his needs than did MCI Norfolk. Accordingly, there is no basis for concluding that Dr. Churchville acted with deliberate indifference.

Once Dr. Churchville transferred Plaintiff to the SBCC infirmary, Dr. Somers treated him with Motrin and warm compresses, given that Plaintiff reported that he was not experiencing any

UC symptoms. She discharged Plaintiff from the SBCC infirmary two days after his admission, as his thrombophlebitis was resolving. The record therefore lacks any evidence of a culpable state of mind on the part of Dr. Somers or that her treatment decisions were less than appropriate.

Plaintiff's allegations concerning his lack of access to Lasix and Humira are also wholly controverted by the evidence. He was prescribed Lasix on June 6, 2016, and although Plaintiff claims that Lasix was not provided to him, MCI Norfolk staff met with Plaintiff one week after receiving his prescription because he was failing to show up to the medication line to receive the Lasix. With regard to Humira, on May 10, 2016, the LSH physicians indicated that Plaintiff was being considered for Humira therapy but that he would first need a follow-up with the GI Clinic in two to three weeks. After Plaintiff returned to LSH following his recurrence of a UC flare, his physician noted that although the hospital was in the process of arranging Humira for him, there would be a delay because Plaintiff still needed to taper his prednisone dosage. Moreover, obtaining authorization to provide Humira would be challenging, given that Plaintiff's UC could be successfully managed with Remicade and his refusal to take the Remicade lacked an objectively reasonable basis. Defendants at MCI Norfolk provided him with other treatment options for his UC, including Remicade, but Plaintiff only wanted Humira or narcotics. At best, Plaintiff's allegations reflect "no more than a disagreement with prison officials about what constitutes appropriate medical care," and therefore cannot state a cognizable claim under the Eighth Amendment. DesRosiers v. Moran, 949 F.2d 15, 20 (1st Cir. 1991); see Miranda v. Munoz, 770 F.2d 255, 259 (1st Cir. 1985) ("[W]here a prisoner has received some medical attention and the dispute is over the adequacy of the treatment, federal courts are generally reluctant to second guess medical judgments and to constitutionalize claims which sound in state tort law[.]" (citations and internal quotation marks omitted)); see also Dias v. Vose, 865 F. Supp.

53, 57 (D. Mass. 1994) ("A disagreement as to the appropriate choice of medical treatment does not give rise to a constitutional violation because the "right to be free from cruel and unusual punishment does not include the right to the treatment of one's choice" (quoting Layne, 657 F.2d at 473)).

In sum, the record contains no evidence that Defendants acted with deliberate indifference and in fact shows that they were attentive and consistent in providing medical care to Plaintiff. Summary judgment is therefore granted on Count I.

## C. Retaliation (Count II)

In Count II, Plaintiff essentially repurposes his allegations of deliberate indifference to assert that Defendants retaliated against him for filing this lawsuit by ignoring his medical needs, denying him Lasix and Humira, and transferring him to the SBCC infirmary. To survive summary judgment, Plaintiff must demonstrate that (1) he engaged in protected activity, (2) the prison officials took an adverse action against him, and (3) there is a causal link between the former and the latter. Hannon, 645 F.3d at 48. "Because prisoner retaliation claims are 'easily fabricated[ ] and . . . pose a substantial risk of unwarranted judicial intrusion into matters of general prison administration,' courts must insist that such claims are bound up in facts, not in the gossamer strands of speculation and surmise." Id. (quoting Bennett v. Goord, 343 F.3d 133, 137 (2d Cir. 2003)). It is "incumbent upon plaintiff to 'furnish a factual basis to support a reasonable inference of a retaliatory animus,'" Lopes v. Riendeau, 177 F. Supp. 3d 634, 661 (D. Mass. 2016) (quoting Hannon, 645 F.3d at 50). When a defendant presents "a legitimate reason for the action and the plaintiff provides no evidence to dispute it, a court will not 'speculate about a hidden motive' at the summary judgment stage." Lopes v. Riendeau, No. 14−10679, 2017 WL 1098812, at *8 (D. Mass. Mar. 23, 2017) (quoting Hannon, 645 F.3d at 51). Here,

Plaintiff's filing of the instant lawsuit plainly satisfies the first prong. Hannon, 645 F.3d at 48 (filing a grievance and taking legal action constitutes protected activity); see Schofield v. Clarke, 769 F. Supp. 2d 42, 47 (D. Mass. 2011) (prisoner's "filing of grievances and lawsuits falls within the scope of protected activity under the First Amendment"). The central questions are whether Defendants took an adverse action against Plaintiff, and if so, whether they acted with retaliatory intent.

Plaintiff alleges that Defendants retaliated against him by transferring him to the SBCC infirmary and denying him access to his preferred medications. First, "[a]lthough a transfer of a prisoner to another facility, if made by reason of the prisoner's exercise of his First Amendment rights, may be an 'adverse action,'" Schofield, 769 F. Supp. 2d at 47 (quoting McDonald v. Hall, 610 F.2d 16, 18 (1st Cir. 1979)), the undisputed facts show that Plaintiff was transferred to the SBCC infirmary for his benefit rather than his detriment. At the time of the transfer on May 24, 2016, Plaintiff had been diagnosed with superficial thrombophlebitis and was continuing to refuse UC medication. Defs. Facts ¶¶ 90, 92. The SBCC infirmary was not a disciplinary unit but a 24-hour infirmary that enabled medical staff to more closely observe patients, like Plaintiff, who were noncompliant with their medical treatment plans, including patients on hunger strikes, diabetic patients refusing to take insulin, and patients with cardiac histories refusing to take their cardiac medication. Id. ¶ 91. According to Dr. Ruze and Dr. Churchville, Plaintiff was transferred to the SBCC infirmary so that he could receive a "higher level of care given [his] behavioral issues and active [UC] as well as [a] new diagnosis of superficial thrombophlebitis." Id. ¶ 92. Plaintiff was also only admitted to the SBCC infirmary for two days, during which time his condition improved. Even considering that "a retaliatory intent may be inferred from the chronology of events," Schofield, 769 F. Supp. 2d at 47, the record here lacks any evidence to

refute or contradict the non-retaliatory reason for transferring Plaintiff to the SBCC infirmary, and there is no evidence that the transfer itself was an adverse action, as opposed to a favorable one, given Plaintiff's medical conditions and his history of noncompliance with his treatment plan.

Plaintiff's remaining argument, that Defendants retaliated against him by not providing medical care, is unavailing for the same reasons he failed to create a genuine issue of material fact with respect to deliberate indifference. There is simply no evidence before the Court showing that Defendants took an adverse action against him with regard to the medical care and prescriptions he received. Rather, the record shows that Defendants consistently provided Plaintiff with medical care despite his unwillingness to participate in their treatment plans. Plaintiff has, at best, "merely established that he was denied his preferred course of treatment," which is insufficient to state a claim for retaliation. Niemic, 89 F. Supp. 3d at 211. Summary judgment on Count II is therefore appropriate.[5]

---

[5] Given the discussion above concerning the individual defendants' conduct, the record does not support the imposition of § 1983 liability against MPCH. First, Plaintiff named MPCH as a defendant in the caption of the Amended Complaint but included no allegations pertaining to MPCH in the body of the complaint. See Redondo Waste Sys., Inc. v. Lopez-Freytes, 659 F.3d 136, 140 (1st Cir. 2011) (naming defendant in the case caption but not mentioning that defendant in the body of the complaint failed the plausibility standard); Cuadrado v. Devine, No. 09−178, 2009 WL 2151392, at *2 (D.R.I. July 17, 2009) (dismissal for failure to state a claim where a defendant was named in the caption of the civil cover sheet but "not mentioned in the body of the complaint"); Pandey v. Freedman, 66 F.3d 306, 1995 WL 568490, at *3 (1st Cir. 1995) (unpublished) (affirming dismissal of defendant named in the caption of the complaint where no allegations against defendant included in body of complaint). Assuming, arguendo, that MPCH was a properly named defendant, and that MPCH could be held liable under § 1983 on a theory resembling municipal liability, no liability can be predicated on municipal policy or custom where there was "no constitutional violation by the employees of the municipality." Leavitt v. Corr. Med. Servs., Inc., 645 F.3d 484, 504 (1st Cir. 2011). Because the individual Defendants did not violate Plaintiff's constitutional rights, and Plaintiff has not shown a constitutional violation by any other employee of MPCH, Plaintiff's § 1983 claims against MPCH cannot survive Defendants' motion for summary judgment.

## V.       CONCLUSION

For the foregoing reasons, Defendants' motion for summary judgment [ECF No. 81] is

GRANTED in favor of all Defendants on the remaining claims.

**SO ORDERED.**

March 21, 2018

                                          /s/ Allison D. Burroughs
                                          ALLISON D. BURROUGHS
                                          UNITED STATES DISTRICT JUDGE